IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADEBOLA AIYEDOGBON,<br><br>       Petitioner,<br><br>  v.<br><br>M. C. EVANS, Warden, and BILL LOCKYER, Attorney General,<br><br>       Respondents.<br>_____ / | No. C 06-3822 WHA (PR)<br><br>**DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set forth below the petition is **DENIED**.

**STATEMENT**

A San Mateo County jury convicted petitioner of attempted murder, *see* Cal. Penal Code §§ 664, 187(a)) (count 1); forcible rape, see *id.* § 261(a)(2)) (count 2); forcible oral copulation, *see id.* § 288a(c)(2)) (count 3); and corporal injury on a former spouse, *see id.* § 273.5(a)) (count 4). The jury found the allegations of premeditation and great bodily injury as to count one to be true. *See id.* §§ 189, 12022.7(a). The jury found not true allegations of great bodily injury as to counts two and three. In a bifurcated trial, the jury found true two prior conviction

allegations, one of which was alleged as a qualifying prior under the "one strike" law, *see id.* § 667.61(d)(1)), and the "habitual sexual offender" law, *see id.* § 667.61(a)), both of which were alleged as qualifying priors under the "three strikes" law, *see id.* § 1170.12(c)(2)). The jury also found that appellant served two prior prison terms, *see id.* § 667.5(b). He was sentenced to a total of 175 years to life in prison.

His conviction was affirmed on direct appeal by the California Court of Appeal, and the California Supreme Court denied review.

The following facts are taken from the opinion of the California Court of Appeal:

> Appellant and the victim, Toyin B., were married in Nigeria in 1983 and had two sons, ages 12 and 13 at the time of trial. Appellant came to the United States in 1983, followed four years later by the victim. In 1993, appellant pled guilty to rape and was sent to prison. In 1994, the victim divorced appellant but remained in a "romantic relationship" with him through 2002. In 1996, she married Eric B. and then separated from him in 2002. In approximately November 2001, appellant moved back in with the victim and their children. The victim did not intend to reunite with or remarry appellant, but permitted him to move in with them for the sake of the children and until he could "get [back] on his feet." After moving back in, appellant beat the victim on a daily basis. She did not call the police because appellant was on parole and she did not want him to go to prison. Despite his abusive behavior, the victim continued to have consensual sex with him.
>
> On September 28, 2002, the victim met Dennis Cowen at a gas station near her house. He flirted with her and she told him she was looking for a job and thought he might help her find one. They agreed to meet that evening at a restaurant and she would bring her paperwork. Before going to meet Cowen, the victim told appellant she was going out and would return soon. When the victim arrived at the restaurant, she called Cowen and they agreed to meet at a different restaurant, the Peppermill.
>
> While Cowen and the victim were seated at the Peppermill and about to eat, the victim saw appellant and told Cowen of his presence. Appellant then approached the victim and in their Yoruba language, said, "Is this where you're coming to?" and she replied affirmatively. Appellant then said to Cowen, "You don't know who you're messing with. I'm F.B.I." The victim explained to Cowen that appellant was not her current, but her ex-husband. After appellant left the table, a waitress told Cowen and the victim that appellant offered to buy them a drink, which they refused. Appellant appeared to be very angry and a waitress walked him out of the restaurant. As the victim left the restaurant and entered her car, appellant drove up behind her. When she stopped, he exited his car and approached her with something in his hand. The victim then drove away and appellant reentered his car. Concerned about Cowen's safety, the victim drove to the back of the Peppermill and called him. She then saw appellant standing in front of Cowen's car and Cowen said appellant would not let him leave. Subsequently, Cowen left the parking lot and he and the victim went to a bar for a drink.

When the victim arrived home at about 2:00 a.m., appellant was there. As she left her sons' bedroom after looking in on them, appellant grabbed, kicked and dragged her to the master bedroom saying, "I'm killing you tonight. You die tonight." He then locked the bedroom door. Afraid for her safety, the victim ran into the bathroom and locked the door. As she was changing into her nightgown appellant demanded that she come out or he would knock down the door. When she opened the door he grabbed her by the throat and began beating her with his fists and pulling her hair. She scratched him in an attempt to defend herself. He continued threatening to kill her and said he would kill her if she opened the door. At one point he choked her and she passed out until he began kicking her in the ribs. At another point when appellant left the bedroom, the victim tried to use the phone to record a message about what was happening. However, appellant returned, continued to threaten to kill her and again rendered her unconscious. When the victim regained consciousness they continued struggling. He removed his clothes, pushed her onto the bed, removed her clothes and raped her while his elbow was on her throat. He forced her to orally copulate him and struck her when she tried to get up. He then used a necktie to tie them together while he slept.

Later that morning, the victim's pastor, James Eli, called as he usually did on Sunday mornings, and the victim asked to speak with Eli's wife, Kim West-Eli. Appellant ordered her not to say anything about what had happened. The victim told West-Eli that she was coming to see her, and appellant let her leave to avoid arousing West-Eli's suspicion. Appellant directed the victim to wear a turtleneck and makeup to cover the injuries he inflicted to her neck, eyes and forehead. She also suffered injuries to her hand and leg.

When the victim arrived at Eli's house, they immediately saw she was injured and persuaded her to call the police. She reported the incident to the police who transported her to the hospital for treatment. When the victim returned home from the hospital, appellant was not there. After that he wrote her many letters and called her several times. In one phone call, appellant told her in Yoruba not to cooperate with the prosecution. In another phone call which was recorded, transcribed, and translated for the jury, appellant admitted to the victim that he strangled her.

The victim admitted being convicted of possessing stolen property in 1991, pleading guilty to welfare fraud sometime between 1999 and 2002, and pleading guilty to theft in 2000. On cross-examination, she admitted that on one occasion she slapped appellant in front of Pastor Eli and on another occasion bit appellant on the back in self-defense.

Eli testified he had known appellant and the victim since 2001 and they had discussed their marital problems with him. On one occasion Eli went to their home after they called to report an argument. When Eli arrived, appellant angrily complained that the victim had "messed up" his life and he could not start a business. He began beating his chest and saying, "You're going down." Appellant told Eli that if the victim died, he would not care and would "just smoke a cigarette." Eli opined that appellant believed he was still married to the victim and was concerned about her spending time with other men. Eli said that when the victim arrived at his home on the morning after the charged offenses she was "hysterical" and had bruises on her eyes, neck and chest. She told Eli about what took place at the Peppermill and that, thereafter, appellant had choked her till she lost consciousness and raped her.

3

  South San Francisco Police Officer Adam Plank interviewed the victim at Eli's home and transported her to the hospital. He described the victim as crying and shaking, with bruising around her eye and neck and a cut on her lower lip. The victim told him she had been raped and assaulted by appellant and that appellant threatened to kill her while choking her.

  Nurse Sally Thresher performed a sexual assault examination on the victim following the incident. The victim appeared to be in a state of shock and had significant bruising around her neck and on her eyelids. The victim said that in the course of the assault and rape appellant hit her with a fist, struck her with a metal candle holder, body slammed her against the wall and choked her twice. The victim said she was also repeatedly forced to orally copulate appellant. Thresher's physical findings were consistent with the history given by the victim. The victim told Thresher that in the course of trying to fend off appellant's attack, she scratched him, breaking off two acrylic fingernails. A forensic examination of appellant following the assault revealed two small, fresh abrasions to his face consistent with being scratched by a fingernail.

  Shortly after the incident, the victim gave consistent versions of the assault and rape, and the events leading up to it, to friends Moruf Oladapo and Wasiu Olowo. When Oladapo and Olowo visited appellant in jail to get his side of the story, appellant said he and the victim had argued but he denied doing anything to her. He suggested that the victim may have injured her neck with an iron.

  Forensic pathologist Peter Benson testified it takes between four and six minutes for strangulation to result in death, but seconds to result in unconsciousness. Dr. Benson opined that the petechial hemorrhages to the victim's eyelids and the bruising of her neck were consistent with multiple efforts at strangulation. Her injuries were not consistent with self-infliction with an iron.

  In 1992, L.M. applied for a job at a Daly City store owned or run by appellant. After submitting her application to appellant, he asked her to return for an interview. At the end of the interview she heard what sounded like the door being locked. Appellant returned to where she was seated and asked her to have sex with him. After she replied, "Hell no," he grabbed her forcibly from behind, pulled off her pants, removed his own clothes and raped her from behind. In the course of the assault he grabbed her around the neck to restrain her.

  Finally, the prosecution introduced a recorded telephone conversation made by appellant to Toyin B. while he was in jail in which he admitted he had "offended" and "strangled" her. [FN3. The conversation, which was transcribed and translated into English, was admitted into evidence.]

*The Defense*

  Testifying in his own defense, appellant denied raping L.M. Instead, he testified that after her third visit to his store they had consensual sex in the motel where she lived, after which she asked him for a pager, $400 or a job. However, appellant admitted that in August 1993 he pled guilty to raping L.M. Upon his release from prison in October 1994, he resumed living with Toyin B. Appellant testified that in 1996 he pled guilty to burglary and theft and was incarcerated until April 1999. He was then placed in immigration detention until August 2001 when he resumed living with Toyin B. Appellant said that while he was in

4

custody he was unaware that the victim had divorced him and remarried.

Appellant denied ever hitting the victim. He said on one occasion in late 2001, when he tried to take her purse containing illegal drugs away from her, she bit him on his back. The next day she punched him with her fist and bit him on his lip.

According to appellant, on the night of the incident, the victim left the house shortly before 8:00 p.m. without telling him where she was going. He later went to the Peppermill for a drink. He noticed the victim's car in the parking lot and went inside the restaurant. As he later left the restaurant, he saw the victim and a man seated together. He approached them, said she was his wife, showed the man a picture of her and their children, and told the man not to believe her lies. After they rejected his offer of a drink, appellant left the restaurant. When he saw the man leave the restaurant, appellant approached the man to introduce himself and they talked. Appellant denied threatening the man or blocking his car. Appellant then saw the victim drive by and he drove home.

Appellant said that when the victim got home she slammed the door and went into their bedroom. He denied dragging her into the bedroom. After changing into her nightgown she appeared to be very angry, shaking her arms and asking him why he had followed her. He took her arm in an effort to calm her down and she laid on his chest. He was scratched while trying to calm her down. The victim then told him she was depressed because she had been fired from her job and they had bills to pay. After she calmed down they had consensual intercourse and oral sex. He denied choking, striking or kicking her. When she left home early the next morning she had no injuries.

Appellant acknowledged writing a letter to the victim from prison in violation of the restraining order against him. He denied admitting in the recorded phone conversation that he strangled her, and said the translation from Yoruba was incorrect. Instead, he said he asked her in surprise, "Did I choke you?"

On rebuttal, Daly City Police Officer David Boffi testified that when he interviewed appellant about the rape of L.M., appellant denied knowing L.M. and having sex with her.

(Exh. 8 at 2-7.)

## DISCUSSION

**A. STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28

5

U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the

6

petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

**B.    ISSUES PRESENTED**

As grounds for federal habeas relief, petitioner asserts that: (1) his due process rights were violated by the trial court's admission of evidence of a prior rape to show propensity; (2) his due process rights were violated when the trial court gave CALJIC 2.50.1, relating to evidence of prior sexual offenses; (3) his due process and Ex Post Facto Clause rights were violated by treating his two 1993 felonies as two strikes; (4) treating the two 1993 felonies as two strikes violated the Eighth Amendment; and (5) retroactive application of the "three strikes" law violated the Contract Clause of the Constitution.

**1.    Admission of Evidence of Prior Rape**

Petitioner first contends that admission of evidence of the of the Marzett rape under California Evidence Code section 1108 violated due process. Section 1108 is the exception to the general rule, codified in section 1101, that evidence of a defendant's character is inadmissible to prove his or her conduct on a specific occasion. Section 1108 allows the admission of evidence of prior sexual offenses,[1] subject to balancing the evidence's probative value against its prejudicial effect in accordance with Evidence Code section 352.[2]

The California Court of Appeal held that admission of evidence pursuant to section 1108 does not violate federal due process, concluding that a binding decision of the California Supreme Court, *People v. Falsetta*, 21 Cal. 4th 903, 921-22 (1999), had so held (Exh. at 7-8).

**a.    Lack of Clearly-Established Supreme Court Authority**

Petitioner argues that the evidence of prior sexual assaults was admitted to show

---

[1] Section 1108 of the California Evidence Code provides: "[In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

[2] Under Evidence Code section 352, a trial court may exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusion of the issues, or of misleading the jury.

7

propensity and that this is a violation of due process. The United States Supreme Court has never held that admission of evidence of prior crimes to show propensity violates the right to due process. *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991) (declining to rule on the constitutionality of propensity evidence); *Garceau v. Woodford*, 275 F.3d 769, 774 (9th Cir. 2001). Because habeas relief in this AEDPA case cannot be granted unless the state court's decision was contrary to, or an unreasonable application of, clearly-established Supreme Court authority, and there is no clearly-established Supreme Court authority, habeas relief could not be granted even if the court were to hold that petitioner's due process rights were violated – which they were not, as discussed below.

### b. Due Process

A state court's evidentiary ruling is not subject to federal habeas review unless the evidentiary ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *Pulley v. Harris*, 465 U.S. 37, 41 (1984). A federal court cannot disturb on due process grounds a state court's decision to admit evidence of prior bad acts unless the admission was arbitrary or so prejudicial that the trial was rendered fundamentally unfair. *See Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986).

As the California Supreme Court noted in *Falsetta*, the rule against propensity evidence is venerable. However, this rule was never absolute. *See Falsetta*, 21 Cal.4th at 913-16. Although every jurisdiction in the United States has a rule excluding propensity evidence, courts have routinely made exceptions in cases of prosecutions for sex offenses, either through carving out specific exceptions for sex offenses, through stretching the use of traditional exceptions, or through making exceptions for evidence of "lustful disposition." *Id.*; *see also United States v. LeMay*, 260 F.3d 1018, 1025-26 (9th Cir. 2001).

While the Ninth Circuit has not specifically ruled on the constitutionality of section 1108, several circuits have upheld the use of propensity evidence under Federal Rules of

8

Evidence 413-414.[3]  *See, eg., United States v. Castillo*, 140 F3d. 874, 881 (10th Cir. 1998); *United States v. Mound*, 149 F3d. 1427 (8th Cir. 1992).  In this jurisdiction, the Ninth Circuit affirmed the constitutionality of Rule 414 in *LeMay*.  The court held in *LeMay* that Rule 414 is not unconstitutional because it is limited in its function by Rule 403.  *LeMay, 260 F.3d at 1026-27*.  Rule 403 directs judges to exclude any evidence submitted under Rule 414 that is more prejudicial than probative.  *Id.* at 1027.  The court reasoned that this balancing process eliminates any due process concerns from Rule 414, stating: "[a]s long as the protections of Rule 403 remain in place to ensure that potentially devastating evidence of little probative value will not reach the jury, the right to a fair trial remains adequately safeguarded."  *Id.* at 1026.

The reasoning of *Le May* applies equally to this case because the California rules are analogous to the federal rules.  Evidence that is admissible under section 1108 is limited by section 352.  Cal. Evid. Code § 1109(a)(1).  Section 352 parallels Federal Rule of Evidence 403 because it permits a trial judge to exclude evidence when its probative value is substantially outweighed by its prejudicial effect.  Cal. Evid. Code § 352.  As the California Supreme Court held in *Falsetta*, 21 Cal.4th at 913, the requirement under section 352 to balance the prejudicial effect of the evidence against its probative value ensures that evidence admitted under section 1108 will not infringe on the right to a fair trial guaranteed by the Due Process Clause.  The trial court here conducted a hearing on the prosecution motion to permit evidence of the Marzett rape and balanced the proposed testimony's probative value against the risk of undue prejudice (Exh. 8 at 8-9).  Petitioner's due process rights were not violated.

### c. Conclusion

For the above reasons, petitioner's claim that he is entitled to habeas relief because admission of evidence under Rule 1108 violated his due process rights is without merit.

### 2. Constitutionality of CALJIC 2.50.01

---

[3] The California Supreme Court noted that Evidence Code section 1108 was adopted after Federal Rule 413 and was modeled on it.  Rule 413 provides in pertinent part: "(a) In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant."  Fed. R. Evid. 413 (a).

9

The trial court gave the 2002 version of CALJIC No. 2.50.01, which as given read:

> Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense other than that charged in this case.
>
> "Sexual offense" means a crime under the laws of a state or of the United States that involves[:]
>
> Any conduct made criminal by Penal Code section 261(a)(2), rape. The elements of this crime are set forth elsewhere in these instructions.
>
> If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the rape of which he is accused in this case.
>
> However, if you find by a preponderance of the evidence that the defendant committed a prior sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime of rape. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime. Unless you are otherwise instructed, you must not consider this evidence for any other purpose.

(Exh. 1, vol. 2 at 240.)

Petitioner argues that the jury could have determined, by a preponderance of the evidence, that he was committed the Marzett rape, and then concluded that was guilty of the charged rape, without passing that inference through a proof-beyond-a-reasonable-doubt filter.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Id.* at 72. The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id*. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d

1 314, 317 (9th Cir.), *cert. denied*, 488 U.S. 861 (1988).  The court must inquire whether there is
2 a "reasonable likelihood" that the jury erroneously applied the instruction in a way that violates
3 the Constitution.  *Estelle*, 502 U.S. at 72 & n.4.

4 Here, the court of appeal concluded that the instructions did not violate due process
5 based on the California Supreme Court's holding that the 1999 revision of the instruction did
6 not violate federal due process, and dictum in that case praising the 2002 revision, the one at
7 issue here, as a further improvement on the 1999 revision (Exh. 8 at 13, discussing *People v.*
8 *Reliford,* 29 Cal. 4th 1007, 1011-16 (2003)).

9 CALJIC No. 2.50.01 explicitly instructed the jury that "if you find by a preponderance
10 of the evidence that the defendant committed a prior sexual offense, that is not sufficient by
11 itself to prove beyond a reasonable doubt that he committed the crime of rape of which he is
12 accused in this case."[4]  Given such a specific mandate, it is not reasonably likely that the jury
13 might believe it could convict on a preponderance standard.

14 Moreover, the other jury instructions bolster this conclusion.  The trial court instructed
15 the jury with CALJIC No. 2.90 that the prosecution had "the burden of proving [Petitioner]
16 guilty beyond a reasonable doubt," and with CALJIC No. 2.01, which provides that "each fact
17 which is essential to complete a set of circumstances necessary to establish the defendant's guilt
18 must be proved beyond a reasonable doubt.  In other words, before an inference essential to

---

[4] This language from the 2002 revised instructions distinguishes this case from *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004), in which the Ninth Circuit held that a petitioner's due process rights were violated when the trial court gave the 1996 version of the 2.50.01 instruction.  *Id.* at 814.  The 1996 version of 2.50.01 allowed a jury to consider evidence of prior uncharged sex offenses and to infer the defendant's guilt of the current offense from the prior uncharged offences.  *Id.* 817-18.  As the 1996 version of CALJIC 2.50.1 required only a preponderance of the evidence to prove the uncharged offenses, CALJIC 2.50.1 and 2.50.01 together allowed a jury to find a defendant guilty without requiring proof beyond a reasonable doubt.  *Id.* at 822.  The heart of the *Gibson* decision is the court's conclusion that the pre-revision instructions given in that case provided "two routes of conviction, one by a constitutionally sufficient standard and one by a constitutionally deficient one."  *Id.* at 823.  When it is impossible to know whether a jury used the impermissible legal theory or the one which meets constitutional requirements, the unconstitutionality of one of the routes requires that the conviction be set aside.  *Id.* at 825.  In the revised version of the instruction, however, the constitutionally-deficient route was blocked off:  The revised instruction tells the jury in unequivocal words that it cannot find petitioner guilty beyond a reasonable doubt just because it had found by a preponderance of the evidence that he committed prior bad acts.  Indeed, *Gibson* suggested that the 1999 revised instruction would pass constitutional muster.  387 F.3d at 818-19.

11

1  establish guilt may be found to have been proved beyond a reasonable doubt, each fact or
2  circumstance upon which such inference necessarily rests must be proved beyond a reasonable
3  doubt" (Exh. 1 at 226, 253). Given that juries are presumed to follow their instructions, *Weeks*
4  *v. Angelone*, 528 U.S. 225, 234 (2000), there is no reasonable likelihood that the jury, in
5  considering the instructions as a whole, erroneously applied CALJIC 2.50.01 in a way that
6  violates the Constitution.

7  Giving the instruction did not violate due process

### 3.     1993 Felonies

Petitioner asserts that his due process and Ex Post Facto Clause rights were violated by the sentencing court's treatment of his two 1993 convictions as two separate strikes. Although the crimes, rape and committing a lewd and lascivious act with a child under fourteen, were committed on separate occasions against different victims, the cases were brought and tried together (Exh. 8 at 20).  In 1997 the California Supreme Court decided *People v. Fuhrman*, 16 Cal.4th 930 (1997), in which it held that "a prior qualifying conviction need not have been brought and tried separately from another qualifying conviction in order to be counted as a separate strike." *Id.* at 933.

Respondent contends that this claim is procedurally defaulted because it was not raised contemporaneously in trial court. The court of appeals agreed, although it also went on to consider the merits (Exh. 8 at 20). The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where counsel failed to object in trial court. *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999). Respondent, therefore, is correct that these issues are procedurally defaulted, and because petitioner has not shown cause and prejudice or a miscarriage of justice, *see Coleman v. Thompson*, 501 U.S. 722, 750 (1991), this claim is barred. The claim alternatively will be considered on the merits, however.

Even though the Ex Post Facto Clause applies only to the legislative branch of government, there is a due process counterpart which prevents retroactive enlargement of the

1  reach of criminal statutes by judicial interpretation. *Rogers v. Tennessee*, 532 U.S. 451, 455-56
2  (2001). "If a judicial construction of a criminal statute is unexpected and indefensible by
3  reference to the law which had been expressed prior to the conduct in issue, the construction
4  must not be given retroactive effect." *Id.* at 457 (internal quotation marks and brackets
5  omitted). This rule applies when a court construes a legislatively-enacted criminal statute, as
6  well as when it develops the common law. *Id.* at 459-61.

7  Due process protects against judicial infringement of the right to fair warning that
8  certain conduct will give rise to criminal penalties. *Bouie v. City of Columbia*, 378 U.S. 347
9  (1964). *Bouie* is not violated unless judicial construction of a criminal statute represents a
10 "radical and unforeseen" departure from former law. *Webster v. Woodford*, 369 F.3d 1062,
11 1069 (9th Cir. 2004).

12 *Fuhrman* was not a radical and unforseen departure from former law. The three-strikes
13 law contains no "brought and tried separately" requirement, but another enhancement provision,
14 section 667(a) of the Penal Code, does (Exh. 8 at 20-21). Petitioner's argument is that the
15 California Supreme Court's holding that there is no such requirement in the three-strikes law
16 was unforeseeable, but the fact is that the three-strikes law contained no such requirement and
17 667(a) did; when there is an explicit clause in one statute that imposes a restriction, and another
18 has no such explicit clause, it is not unforeseeable that the statute lacking the clause will be
19 construed not to be subject to it.

20 In addition, although retroactive increases in the scope of criminal liability by judicial
21 construction are barred by the Fourteenth Amendment Due Process Clause, retroactive sentence
22 enhancements by judicial construction do not violate due process. *United States v. Newman*,
23 203 F.3d 700, 703 (9th Cir. 2000); *see also Holgerson v. Knowles*, 309 F.3d 1200, 1203 (9th
24 Cir. 2002) (holding that the Supreme Court has not clearly established that retroactive sentence
25 enhancements by judicial construction violate due process). Thus even if the *Fuhrman* decision
26 did amount to a retroactive sentence enhancement, it could not be the basis for federal habeas
27 relief because there is no clearly-established Supreme Court authority holding that due process
28 prohibits such increases. *See Holgerson*, 309 F.3d at 1203. This claim is without merit.

13

### 4. Eighth Amendment

Partly as a result of the sentencing court's treating the 1993 convictions as two strikes, petitioner was sentenced to 175 years to life in prison. He contends that the sentence was cruel and unusual, a violation of the Eighth Amendment.

Respondent again contends that this claim is procedurally defaulted because it was not raised contemporaneously in trial court. The court of appeals agreed, although it also went on to consider the merits (Exh. 8 at 22 n.19). For the reasons discussed in section three above, this claim is procedurally barred, but also will be considered on the merits.

In *Ewing v. California*, 538 U.S. 11 (2003), and *Lockyer v. Andrade*, 538 U.S. 63 (2003), the United States Supreme Court considered whether sentences imposed under California's "three-strikes" law violated the Eighth Amendment. In *Andrade*, a habeas case, the Court held that the "only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Id.* at 73 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)). The Court also made clear that the offense to which gross disproportionality review should be applied should not be defined in terms of just the offense of which petitioner was convicted, but that a prisoner's record of recidivism is to be considered. *Ewing*, 538 U.S. at 29.

A comparison of petitioner's case to both *Ewing* and *Andrade* reveals the inadequacy of his claim. In *Ewing*, the Supreme Court upheld a sentence of twenty-five years to life, pursuant to California's "three-strikes" law, against a recidivist prisoner convicted of grand theft. *Ewing*, 538 U.S. at 30-31. In *Andrade* the Supreme Court upheld a sentence of two consecutive terms of twenty-five years to life, pursuant to California's "three-strikes" law, where the defendant was convicted of two counts of petty theft. *Andrade*, 538 U.S. at 76. In both *Ewing* and *Andrade* the prisoners had lengthy criminal records and their triggering offenses were "wobblers", meaning the charges could have been classified as either felonies or misdemeanors at the discretion of the prosecutor or trial judge. *Andrade*, 538 U.S. at 66-67; *Ewing*, 538 U.S. at 16-19.

14

In the present case petitioner has a serious criminal record, including convictions for rape and lewd and lascivious conduct with a child under fourteen. Unlike the convictions in *Ewing* and *Andrade*, petitioner's triggering convictions, attempted murder, forcible rape, forcible oral copulation, and corporal injury on a former spouse are both violent and extremely serious. Thus, although the sentence here was more severe than those in *Ewing* and *Andrade*, both the prior offenses and the current one were dramatically more serious. The sentence here was not disproportionate to the offense.

Petitioner relies on the Ninth Circuit decision in *Ramirez v. Castro*, 365 F.3d 755 (9th Cir. 2004), where the court held that a sentence of twenty-five years to life on petty theft with a prior conviction was grossly disproportionate to the crime where the defendant's previous two strikes were the result of one negotiated plea resulting in a single county jail sentence. *Id.* at 768. The only similarity, however, is that petitioner's 1993 convictions were pursuant to one negotiated plea and he served a single prison sentence. The offenses in this case, both the triggering offenses and the priors, are dramatically more serious, as discussed above. The difference, when it is so striking and when the question is one of whether the sentence is disproportionate, is more than sufficient to distinguish *Ramirez.*

The sentence did not violate the Eighth Amendment.

**5.     Contract Clause Claim**

Petitioner contends that the sentencing court's having treated his 1993 convictions as two strikes, even though they were not brought and tried separately, violated the Contract Clause of the Constitution. *See* U.S. Constitution, art. I, § 10 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts.").

Under California law, plea bargains are interpreted according to contract law principles, Cal. Civ. Code § 1635; *Buckley v. Terhune*, 441 F.3d 688, 695 (9th Cir. 2006) (en banc), and "are deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws," *People v. Gipson*, 117 Cal. App. 4th 1065, 1070 (2004) (internal quotation marks omitted). That is, the 1993 plea bargain included an implied term allowing the State to change

15

the law, such as by enacting the three-strikes law.  There thus was no contractual violation to which the Contract Clause would apply.  This claim is without merit.

///

**CONCLUSION**

The petition for a writ of habeas corpus is **DENIED**.  The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: April   21  , 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

G:\PRO-SE\WHA\HC.06\AIYEDOGBON822.RUL.wpd